No. 22-30178

# In the
# United States Court of Appeals
# for the Fifth Circuit

---

KIRK MENARD,

*Plaintiff - Appellee*

v.

TARGA RESOURCES, L.L.C.,

*Defendant - Appellant*

---

On Appeal from the United States District Court for the
Middle District of Louisiana
Civil Action No. 3:19-CV-50

---

## BRIEF OF APPELLEE
## KIRK MENARD

---

SUBMITTED BY:

Eulis Simien, Jr., LA Bar # 12077
eulissimien@simien.com
Roy L. Bergeron, Jr., LA Bar # 33726
roybergeron@simien.com
Simien & Simien, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809-0000
(225) 932-9221; (225) 932-9286 (fax)

ATTORNEYS FOR APPELLEE KIRK MENARD

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellee: | Counsel for Appellees: |
|---|---|
| Kirk Menard | Eulis Simien, Jr.<br>eulissimien@simien.com<br>Roy L. Bergeron, Jr.<br>roybergeron@simien.com<br>Simien & Simien, L.L.C.<br>7908 Wrenwood Boulevard<br>Baton Rouge, Louisiana 70809<br>Telephone: (225) 932-9221 |

| Appellants: | Counsel for Appellants: |
|---|---|
| Targa Resources, L.L.C. | Daniel Patton<br>dpatton@scottpattonlaw.com<br>Scott Patton PC<br>5301 Katy Freeway, Suite 201<br>Houston, Texas 77007<br>Telephone: (281) 377-3266<br><br>Kyle A. Ferachi<br>kferachi@hinshawlaw.com<br>Hinshaw & Culbertson, LLP<br>400 Convention Street, Suite 1001<br>Baton Rouge, Louisiana 70802<br>Telephone: (225) 222-3250 |

   *s/ Roy L. Bergeron, Jr.*
Attorney of record
for Appellee Kirk Menard

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. The dispositive legal issues in this case regarding the Louisiana courts' interpretation and application of the Louisiana Environmental Whistleblower Statute and the federal courts' analysis of causation under the cat's paw theory of liability in employment retaliation matters have been authoritatively decided by state and federal courts, and the Court's evaluation of this case would not benefit from oral argument on those established issues of law. Further the facts and legal arguments regarding these issues are fully and adequately presented in the record and the parties' briefs such that oral argument would not significantly aid in the Court's decisional process.

# TABLE OF CONTENTS

Contents………………………………………………………………………Pages(s)

Certificate of Interested Persons ............................................................. ii

Statement Regarding Oral Argument ..................................................... iii

Table of Contents ................................................................................... iv

Table of Authorities .............................................................................. vi

Statement of the Issues ............................................................................1

Statement of the Case...............................................................................3

    I. Menard's Employment at Targa and Termination for Refusing to Dilute a Sample ....................................................................................................3

    II. The District Court Found That Targa's Asserted Reasons for Menard's Termination Were Not Credible .....................................................7

    III. The District Court Found That Targa Failed to Investigate Any of the Accusations Against Menard.......................................................14

Standard of Review .................................................................................18

Summary of the Argument.......................................................................19

Argument.................................................................................................23

    I. The District Court Correctly Concluded that Menard's Refusal to Dilute a Sewage Sample Protected Him from Retaliation Under the LEWS .............23

        A. The District Court's Conclusion Is Required Under the Text of the LEWS, Legislative Intent, the Louisiana Constitution, and Louisiana Supreme Court Jurisprudence ...........................................................23

B. Any Legal Question About the Interpretation of the LEWS Should be Certified to the Louisiana Supreme Court......................................32

C. As an Additional Basis for Affirming the District Court's Judgment, Menard's Report to His Supervisor of the Request to Dilute a Sewage Sample Was Protected Under the LEWS ..........................33

II. The District Court's Conclusion that Menard's Refusal to Dilute a Sample Was the But-For Cause of His Termination Was Plausible Based on the Evidence and Testimony Presented at Trial ............................................35

A. The District Court Correctly Determined that the Six-Day Period Between the Protected Act and Termination Was Evidence of Causation ...........................................................................................37

B. The District Court Correctly Determined That the Falsity of Targa's Explanations for Menard's Termination Also Established Causation ...........................................................................................38

C. The District Court Correctly Determined that Menard's Refusal to Dilute a Sewage Sample was the Cause of His Termination Under the "Cat's Paw" Theory of Liability ..........................................................41

III. The Record Clearly Supports the District Court's Finding of a Causal Link Between Menard's Refusal to Dilute a Sample and His Termination...... ...............................................................................................53

Conclusion .....................................................................................................56

CERTIFICATE OF SERVICE .............................................................57

CERTIFICATE OF COMPLIANCE....................................................58

# TABLE OF AUTHORITIES

**Cases**……………………………………………………………..**Pages(s)**

*Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016)....................................18

*Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292 (5th Cir. 2008) .....................18

*Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602 (5th Cir. 2007) ........................................................................................... 49-50

*Barfield v. Madison Cnty., Miss.*, 212 F.3d 269 (5th Cir. 2000) ............................25

*Bartlett v. Reese*, 526 So. 2d 475 (La. App. 1 Cir. 1988), *writ denied*, 532 So. 2d 177 (La. 1988).........................................................................................29

*Bear v. Pellerin Const., Inc.*, 2001-0984 (La. App. 4 Cir. 1/30/02), 806 So. 2d 984, *writ denied*, 2002-0943 (La. 6/7/02), 818 So. 2d 777 ...........................................26

*Borcik v. Crosby Tugs, L.L.C.*, 2016-1372 (La. 5/3/17), 222 So. 3d 672.................... .............................................................................................. 26, 28, 29, 31

*Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571 (5th Cir. 2020), *as revised* (Aug. 14, 2020) .........................................................................................38

*Cheramie v. J. Wayne Plaisance, Inc.*, 595 So. 2d 619 (La. 1992) ............................ .............................................................................19, 24, 27-28, 29, 30-31

*Chiro v. Harmony Corp.*, 99-0453 (La. App. 1 Cir. 11/5/99), 745 So. 2d 1198, *writ denied*, 1999-3346 (La. 1/28/00), 753 So. 2d 840................................................26

*Collins v. State ex rel. Dep't of Nat. Res.*, 2012-1031 (La. App. 1 Cir. 5/30/13), 118 So. 3d 43 .................................................................................... 26, 29

*Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352 (5th Cir. 2016) ........................18

*Derbonne v. State Police Comm'n*, 2019-1455 (La. App. 1 Cir. 10/14/20), 314 So. 3d 861, *writ denied*, 2020-01323 (La. 2/17/21), 310 So. 3d 1152 ................. 33-35

*Dumas v. Union Pac. R.R. Co.*, 2007 WL 9701323 (M.D. La. June 27, 2007), *report and recommendation adopted*, 2007 WL 9701298 (M.D. La. July 31, 2007), *aff'd*, 294 F. App'x 822 (5th Cir. 2008) .......................................................................49

*English v. Wood Grp. PSN, Inc.*, 2015 WL 5061164 (E.D. La. Aug. 25, 2015).....33

*F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994), *opinion supplemented on denial of reh'g*, 30 F.3d 601 (5th Cir. 1994) ........................................................37

*First Nat'l Bank of Durant v. Trans Terra Corp.,* 142 F.3d 802 (5th Cir. 1998) ........ ................................................................................................................................ 25-26

*Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752 (5th Cir. 2017), *as revised* (Mar. 30, 2017) ................................................................................................................... 18, 52

*Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236 (5th Cir. 2019) ................ 37-38

*Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002) .........................................................38

*Golf City, Inc. v. Wilson Sporting Goods, Co., Inc.*, 555 F.2d 426 (5th Cir. 1977) .... ............................................................................................................................55

*Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165 (5th Cir. 2014) ................ ..................................................................................................... 42-43, 47, 52

*Griffin v. City of Lafayette*, 166 F.3d 340 (5th Cir. 1998)............................... 18, 44

*In re Ithaca Corp.*, 582 F.2d 3 (5th Cir. 1978) .......................................................55

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). ..................................36

*Long v. Eastfield Coll.*, 88 F.3d 300 (5th Cir. 1996) ...............................................49

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007)............................. 52-53

*Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872 (S.D. Tex. 2009) ..............................................................................................................................38

*Parker v. State of Louisiana Dep't of Educ. Special Sch. Dist.*, 323 F. App'x 321 (5th Cir. 2009) ............................................................................................... 38-39

*Peters v. Harrah's New Orleans*, 418 F. Supp. 2d 843 (E.D. La. 2006)........... 47-48

*Raymond James Tr., N.A., Tr. of E.C. Care Tr. v. Natchez Hosp. Co., LLC*, 2021 WL

5456980, at *1 (S.D. Miss. Nov. 22, 2021) ............................................... 37

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ..................... 39

*Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) ....................... 42

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) ....................... 42

*Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112 (5th Cir. 1998) ............................... 42

*S. S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp.*, 353 F.2d 545 (5th Cir. 1965) ............................................................................................................. 55

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011)...................................................... 49

*Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 101 (2021) ............................................................................................ 18

*United States v. Horton*, 622 F.2d 144, 148 (5th Cir. 1980) ................................. 37

*U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 (1948) ..................................................... 18

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ...................... 52

*Watkins v. Tregre*, 997 F.3d 275 (5th Cir. 2021)................................................... 38

*Wright v. West*, 505 U.S. 277 (1992) ..................................................................... 39

*Zamora v. City of Houston*, 798 F.3d 326 (5th Cir. 2015) .............. 41-42, 49, 51-52


**Statutes**………………………………………………………………**Pages(s)**

Louisiana Constitution, article IX, section 1 ........................................................ 28

La. Civ. Code art. 10 ............................................................................................. 28

La. Civ. Code art. 12 ............................................................................................. 28

La. R.S. 23:967 ................................................................................................. 33-34

La. R.S. 30:2002 .................................................................................................... 28

La. R.S. 30:2027 ........................................................................................... *passim*

**Rules**…………………………………………………………**Pages(s)**

Louisiana Supreme Court Rule XII, § 1 ...................................................32

Louisiana Supreme Court Rule XII, § 2 ...................................................32


**Other Authority**…………………………………………………**Pages(s)**

Merriam-Webster.com Dictionary, "Disclose," https://www.merriam-
    webster.com/dictionary/disclose..............................................................25

Collins English Dictionary - Complete & Unabridged 2012 Digital Edition,
    "Disclose," https://www.dictionary.com/browse/disclose ...................................25

## STATEMENT OF THE ISSUES

1.    Whether the District Court correctly concluded that the Louisiana Environmental Whistleblower Statute ("LEWS"), La. R.S. 30:2027, protects an employee from retaliation by his employer when the employee refuses his employer's instruction to violate environmental laws. Alternatively, whether this Court should certify this question to the Louisiana Supreme Court.

2.    Whether under Louisiana law an employee whose job duties include reporting violations of environmental laws is protected under the LEWS when he refuses his employer's instruction to violate an environmental law. Alternatively, whether this Court should certify this question to the Louisiana Supreme Court.

3.    Whether the District Court's factual findings, including its resolution of factual disputes and conflicting testimony and evaluation of witness credibility, should be affirmed because they are plausible in light of the record viewed in its entirety.

4.    Whether the District Court correctly concluded that the close temporal proximity of only six days between Menard's refusal to participate in the violation of an environmental law and his termination was evidence of causation that helped support a finding of retaliation under the LEWS.

1

5.    Whether the District Court correctly concluded that the falsity of Targa's asserted reasons for Menard's termination was evidence of causation that helped support a finding of retaliation under the LEWS.

6.    Whether the District Court correctly concluded that under the cat's paw theory of liability as applied by this Court, the retaliatory animus of Berthelot, who initiated Menard's termination, was imputed to the final decisionmaker because Targa failed to conduct any independent investigation into the validity of the accusations which were the asserted reasons for termination.

7.    Whether the District Court's factual finding that Menard engaged in a protected act under the LEWS by refusing to dilute a water sample is plausible and supported by the record, such that reversal or remand of the District Court's finding is unwarranted.

<h1 align="center">Statement of the Case[1]</h1>

## I. Menard's Employment at Targa and Termination for Refusing to Dilute a Sample

Kirk Menard began working for Targa Resources, LLC on June 11, 2018, as an environmental, safety, and health ("ES&H") specialist in Venice, Louisiana.[2] Menard's supervisor David Smith primarily worked at a different facility, so although Menard spoke with him regularly, Menard only saw him maybe once during his employment.[3] Menard's ES&H division was supposed to remain separate from the operations division, both to prevent undue influence by the operations division over ES&H and so ES&H employees would not fear "retribution" from operations if they identified potential safety and environmental issues.[4] However, area manager Ted Keller, in charge of operations and the highest ranking employee in Venice, acted as Menard's "indirect supervisor" since he saw Menard daily[5] and Menard could not ignore Keller's instructions.[6]

On October 5, 2018, Menard participated in an operations division conference call in which he reported on a recent sewage exceedance.[7] Perry Berthelot, Targa's

---

[1] At trial, the District Court admitted into evidence the deposition excerpts introduced by the parties without objection. ROA.6617-6621. Although the deposition transcripts were not included with the other trial exhibits in the record, they are already part of the record on appeal as attachments to other pleadings and are cited accordingly.

[2] ROA.6123, 6350.

[3] ROA.6362.

[4] ROA.6605-6606.

[5] ROA.6231, 6336, 6361-6362.

[6] ROA.6335-6336.

[7] ROA.6369-6370.

District Manager, was also on the call and told Menard to call him afterwards to discuss what Targa has done to address exceedances in the past.[8] Menard felt compelled to call Berthelot because he directly supervised of Keller, Menard's "indirect supervisor."[9]

Menard called Berthelot.[10] When Menard discussed the exceedance, Berthelot told Menard he should dilute the sample with half bottled water and half sewage to ensure they passed.[11] Menard believed that what Berthelot instructed him to do would be illegal and a violation of state and federal environmental laws.[12] Menard laughed nervously and told Berthelot, "no, we're going to correct it the right way."[13] Menard explained that Smith discussed retaining a septic expert, but Berthelot complained that would cost money.[14] Menard told Berthelot that he would call Smith to discuss the septic expert, to which Berthelot responded that he would also call Smith.[15]

After his call with Berthelot, Menard tried twice to call Smith.[16] Smith eventually returned Menard's call.[17] Menard told Smith that Berthelot had a concern

---

[8] ROA.6371, 6440.
[9] ROA.6371-6372, 6569-6566.
[10] ROA.6372-6373.
[11] ROA.6374-6375, 6449, 6463-6466, 6565-6567.
[12] ROA.6547.
[13] ROA.6375.
[14] ROA.6375.
[15] ROA.6376.
[16] ROA.6377-6388.
[17] ROA.6295, 6377-6379.

about the cost of an expert.[18] Smith responded that he knew that Berthelot was concerned about costs.[19] Menard then told Smith that Berthelot was upset that Targa had failed another sample and that Berthelot had a "quick fix" to the exceedance, which was diluting the sample.[20] Smith responded, "no, we're not going to do that."[21] Menard's termination process began four days later, on October 9, 2018,[22] and formal termination two days after that, on October 11—only six days after the calls.[23]

In direct violation of Targa's policy that ES&H should be separate from operations, Keller, the direct operations report of Berthelot, to whom Menard made the refusal, led the charge on terminating Menard, an ES&H employee.[24] Keller admitted that between October 5 and October 9, he would have had numerous opportunities to speak with Berthelot and could have found out about Menard's refusal to dilute a sample and to discussed what actions should be taken as a result.[25] And, despite the fact Berthelot was not in Menard's chain of command, five days after Menard's refusal, and one day before Menard's termination, Keller reported to

---

[18] ROA.6379.
[19] ROA.6379.
[20] ROA.6296, 6379.
[21] ROA.6380.
[22] ROA.6146-6147.
[23] ROA.6299, 6350.
[24] ROA.6681.
[25] ROA.6122, 6609-6610.

Berthelot some supposedly inappropriate behavior by Menard.[26]

On October 10, Jarrod Gregg, Smith's supervisor, told Menard to work from home for a day until they could discuss with HR what to do about a complaint about inappropriate comments by Menard.[27] On October 11, 2018, Gregg called Menard to tell him he was being terminated because of his "overall performance."[28] Gregg said nothing about his previous comment about alleged inappropriate comments.[29]

Later that same day, Menard sent a text message to Keller asking what he had done to cause him to be terminated.[30] Keller replied that it was a decision made by management and that he needed to talk to HR.[31] Menard responded, "Knew I shouldn't have spoke to Perry that day."[32]

Menard attempted to submit a "My Safe Workplace" complaint to Targa on October 12, 2018, the day after his termination to report that he was terminated for refusing "to do something illegal on the regulatory and governmental side."[33] However, that site had been shut down, so Menard contacted Targa's CEO, Joe Bob Perkins, directly to submit his complaint.[34]

---

[26] ROA.6143-6144.
[27] ROA.6365-6367.
[28] ROA.6299, 6382-6384, 6659.
[29] ROA.6383.
[30] ROA.6162-6163, 7155-7156.
[31] ROA.6163, 7156.
[32] ROA.6164, 7157.
[33] ROA.3842, 6226-6227, 6844, 7162.
[34] ROA.3842, 3894, 6385-6388, 6844.

Elizabeth Hawkins, who was in Targa's legal department, spoke with Berthelot as part of her investigation into Menard's "My Safe Workplace" complaint.[35] Berthelot testified that he only remembers that the allegations by Menard involved a complaint that he had violated some code of conduct issue, but he claims that he does not remember any of the details.[36] When specifically asked, Berthelot claimed he did not remember being asked by Hawkins about whether he directed Menard to dilute samples, nor did he recall whether he denied that allegation.[37] The District Court found Berthelot's testimony incredible, finding, "[a]lthough this was the first time 'anything like this' had ever happened to Berthelot, he, incredibly, could not recall the details of this conversation."[38]

## II. The District Court Found That Targa's Asserted Reasons for Menard's Termination Were Not Credible

Targa claimed that Menard was not terminated because of his refusal to dilute a water sample, but rather because (1) he had work performance issues, and (2) he had engaged in inappropriate conduct. The District Court concluded that Targa's asserted reasons for Menard's termination were not credible.

Among the evidence the trial court considered was that all of the individuals who provided information or made allegations against Menard fell under Berthelot's

---

[35] ROA.6596.
[36] ROA.6596, 6614-6615.
[37] ROA.6597-6598.
[38] ROA.6996.

chain of command, including Keller.[39] Further, Keller admitted that he had previously advised Menard that he needed to be careful about Berthelot. In particular, there was testimony regarding an incident in which Keller considered Menard to be "insubordinate" because he read an e-mail about a motor vehicle accident policy in a safety meeting after Keller had instructed him not do so do, even though Berthelot had given Menard the contradictory instruction to read the e-mail.[40] Keller warned Menard after that incident that if he made Berthelot look bad, Berthelot would throw Menard under the bus.[41]

## A.    Alleged Work Performance Issues

The only reason for termination stated in Menard's personnel file is performance.[42] However, Menard's supervisor, Smith, testified that he had no issues with Menard's work performance.[43] When Menard would ask Smith what types of reports he was getting from Keller, Smith said "all good" and there were "no complaints."[44] Even Keller, who initiated and led the charge on Menard's termination, admitted that Menard's alleged performance deficiencies alone would not have been sufficient reason to terminate Menard.[45] In fact, only 15 days before

---

[39] ROA.6233-6234, 7138.
[40] ROA.6210-6211.
[41] ROA.6144, 6565.
[42] ROA.6125, 6130-6131, 7077-7078.
[43] ROA.6284, 6317, 6420.
[44] ROA.6364.
[45] ROA.6125-6126, 6132, 6234-6235.

Menard's call with Berthelot, on September 20, Keller told Smith that he was "impressed" with Menard.[46] On September 27, eight days before Menard's conversation with Berthelot, Keller's email complimented Menard, telling him, "I like your weekly report."[47] Certainly, work performance could not have been a reason for Menard's termination, because Jessica Keiser, who made the final decision to terminate Menard, testified the decision had nothing to do with performance.[48]

### B.     Alleged Inappropriate Conduct

Targa also claimed that Menard was fired for alleged inappropriate conduct. Although Targa acknowledged that the reason for Menard's termination should have been stated in his personnel file, there is nothing in his file about inappropriate conduct.[49]

One of the accusations is that Menard showed coworkers an inappropriate picture. It is undisputed that only one person, Nicholas Richard, an employee in the operations division, claims to have seen the picture.[50] Menard received the picture in question from his pregnant wife, who had a sensitive medical condition related to her pregnancy for which she was seeking Menard's opinion on whether or not she

---

[46] ROA.6171-6173, 7060.
[47] ROA.6175-6176, 7056.
[48] ROA.6716.
[49] ROA.6129-6131, 7061-7111.
[50] ROA.6262.

should go to the doctor.[51] When Menard received the picture, he told Richard that his wife had just sent him a picture and that she was pregnant.[52] Menard did not discuss the specific details of the picture with Richard.[53]

Menard testified that he would not have intentionally shown the picture to Richard out of respect his wife's privacy.[54] Menard acknowledged that it is possible that Richard could have seen it when Menard received it on his phone.[55] Richard testified that he only saw the picture for two to five seconds.[56] He never reported it to anyone because he was not bothered by it and it had no effect on his ability to do his job.[57] He briefly told two of his coworkers, Jordie Ancalade and David Duncan (both in the operations division), because they were in the room at the same time and asked him what had happened.[58] Other than the two of them, Richard was not aware that anyone else at Targa even knew anything about the picture.[59] The first time Menard heard that the picture might somehow be connected to his termination was after he filed this lawsuit.[60]

There is conflicting testimony about how the photograph became an issue.

---

[51] ROA.6431.
[52] ROA.6433-6434, 6572-6573.
[53] ROA.6573.
[54] ROA.6435.
[55] ROA.6430, 6434-6435.
[56] ROA.6263.
[57] ROA.6263, 6276-6278.
[58] ROA.6263, 6265.
[59] ROA.6274.
[60] ROA.6437.

Keller claims that he was first told about the photograph on October 9, 2018, by either Keith Adams (an employee in the operations division) or Tony Williams (a contractor who reported to the operations division).[61] Keller testified that Adams or Williams learned about it directly from Richard.[62] This is disputed by Richard's testimony that he only spoke about that incident with Ancalade and Duncan.

Richard testified that Keller first approached him to ask about the picture about two weeks **after** Menard was terminated, and that this encounter lasted less than 10 seconds.[63] In fact, until Keller asked Richard about the picture, Richard believed that Menard was fired for some unknown performance issues, because that was the only thing he had heard.[64] Richard's testimony notwithstanding, Keller claimed that he spoke to Richard on October 10, 2018, one day **before** Menard's termination.[65] Keller's claim of when he spoke to Richard is also inconsistent with the testimony of Tricia Dodson, Targa's HR representative, who testified she did not believe that Keller had asked Richard anything about the picture.[66]

Regardless of when Keller spoke with Richard, it is undisputed that nobody else involved in the termination process ever spoke to Richard about the picture.[67]

---

[61] ROA.6147.
[62] ROA.6150-6151.
[63] ROA.6265-6267, 6275.
[64] ROA.6266.
[65] ROA.6151-6152, 6219.
[66] ROA.6643.
[67] ROA.6267-6269, 6297.

Nor did anyone talk to Menard.[68] Dodson admitted that she did not know the name of the employee who allegedly reported it, or even if the employee who reported it was the employee who saw the picture, because she never bothered to ask Keller for that information or find out on her own.[69]

Targa also claimed that Menard was terminated for making inappropriate comments. Dodson testified that she was told that Menard made comments about being interested in the spouses of coworkers in a "romantic way."[70] However, she did not ask for or seek out any other details about the specific nature of the comments that were allegedly made.[71]

Menard testified that any comments he might have made about the wives or significant others of coworkers would have complementary comments made in the context of coworkers sharing pictures of their families with one another.[72] For example, Menard believes that he might have made a comment about someone's wife being "pretty."[73] Also, on occasion, Menard's coworkers would make comments to one another in a joking context, such as "what she's doing with you?"[74]

The comments that Menard may have made did not indicate that he had a

---

[68] ROA.6151-6152, 6297.
[69] ROA.6636-6638, 6643-6644.
[70] ROA.6645.
[71] ROA.6646-6648.
[72] ROA.6427-6428.
[73] ROA.6427-6428.
[74] ROA.6428-6429, 6531.

romantic interest in anyone's wife or significant other. Targa acknowledged that the meaning of any alleged comments would depend on the context in which they were made,[75] and that this context would also be necessary to determine whether the comments violated Targa's policies.[76] However, nobody involved in the termination process ever asked for details about the specific comments or their context, nor did Keller, as the only source of information, provide such context.[77]

With regards to the specific comments, Richard testified that Menard said that his wife was "cute."[78] Nobody else was around when Menard made this comment,[79] and Richard testified that he never reported it to anyone because it did not bother him.[80] He never spoke to Keller about it,[81] nor did anyone in HR contact him.[82] Keller agreed that the alleged comment about Richard's wife being "cute" was not sexual in nature.[83]

Menard testified that on another occasion he jokingly asked Ancalade what his wife was doing with someone like him.[84] Menard testified that this is the type of

---

[75] ROA.6650-6651.
[76] ROA.6675-6676.
[77] ROA.6651-6652.
[78] ROA.6269.
[79] ROA.6269.
[80] ROA.6270, 6276.
[81] ROA.6270.
[82] ROA.6270.
[83] ROA.6246.
[84] ROA.6531.

joking comment others would make at work.[85] Ancalade claimed instead that Menard told him that he better not mess up or Menard was "going to get" his wife.[86]

There was conflicting testimony as to when and how Keller apparently learned about this comment. Keller claimed that he learned about it directly from Ancalade, who he says volunteered the information when Keller asked what he thought about Menard on October 10, 2018 (the same day Keller claims he spoke to Richard about the photograph, which Richard denied).[87] According to Keller, Ancalade responded, "He's weird. He even made a comment to me about my wife."[88] However, Ancalade denied that he talked to anyone about the comment or that he reported it to anyone.[89] In fact, Ancalade testified that Keller approached him and asked specifically whether it was true that Menard made a comment about his wife.[90] Regardless, Ancalade testified that Menard's comments did not affect his ability to work for Targa or to be around Menard.[91]

### III.    The District Court Found That Targa Failed to Investigate Any of the Accusations Against Menard

The district court findings are undisputedly supported by the evidence. Keller led the charge to terminate Menard though he was not Menard's supervisor nor were

---

[85] ROA.6428-6429.
[86] ROA.4308.
[87] ROA.6152-6153.
[88] ROA. 6152-6153, 6218-6219.
[89] ROA.4316-4317.
[90] ROA.4316-4317.
[91] ROA.4331.

they in the same division.[92] He initiated the termination process by contacting Smith about Menard's alleged conduct on October 9.[93] Smith did not investigate the claims nor did he ask anyone else to do so.[94] Smith never spoke to any of the individuals to whom allegedly inappropriate comments were directed, nor did he speak to Menard.[95] Smith testified he trusted and relied solely upon what Keller told him.[96]

On October 10, 2018, Smith relayed the information from Keller to his supervisor Gregg.[97] Keller spoke with Gregg later that same day, but Keller did not tell nor did Gregg request the identities of the employees involved in the alleged incidents.[98] Without any further investigation, Gregg presented the complaint to Targa's HR department.[99] Gregg spoke with Dodson and relayed only what Keller had told him, assuming HR would investigate, including speaking to Menard.[100]

Later that same day, Gregg met with Dodson and Dawn Strickland, Targa's HR representatives, with Keller on the phone, to relay what Keller had stated about the alleged inappropriate behavior and a generic statement from Keller about Menard's trustworthiness.[101] Keller was the only one who presented any information

---

[92] ROA.6244-6245, 6681.
[93] ROA.6147, 6216-6218.
[94] ROA.6296-6297, 6299, 6344.
[95] ROA.6298, 6343-6344.
[96] ROA.6297-6298, 6338, 6344.
[97] ROA.3691-3692, 6326.
[98] ROA.3693, 6155, 6219.
[99] ROA.3694, 6154-6155.
[100] ROA.3694-3695.
[101] ROA.3696-3697, 6156, 6220-6221, 6224.

about the accusations against Menard.[102] Keller recommended that Menard be terminated.[103] Gregg agreed, based upon what Keller had told him.[104]

Nobody involved in these discussions suggested that they should speak with Menard about these accusations.[105] HR did not conduct any investigation or speak with any of the employees involved and relied solely and directly on Keller, or through second- and third-hand reports of the accusations that originated with Keller.[106]

The termination recommendation went through Targa's legal department before going to Keiser.[107] Elizabeth Hawkins testified that HR recommended termination of Menard, and she simply agreed with that recommendation based solely on the information provided by HR, which in turn was based solely upon the information provided by Keller.[108]

Keiser made the final decision.[109] She, however, made no effort to confirm whether what she was told was true before terminating Menard.[110] Keiser relied solely on information verbally provided to her by HR, which provided no written

---

[102] ROA.3698.
[103] ROA.6221.
[104] ROA.3697, 6221-6222.
[105] ROA.6156.
[106] ROA.6635-6639, 6653-6654, 6684-6685, 6692-6694.
[107] ROA.6668-6669.
[108] ROA.3836-3837, 3839.
[109] ROA.6224-6225, 6669-6670.
[110] ROA.6703-6704, 6708.

report and was based solely upon the unverified information presented by Keller.[111]

Keiser incorrectly assumed that HR had investigated the claims, looked into details,

confirmed information, and spoken to the involved individuals.[112] Keiser was not

even fully aware of why she terminated Menard. She believed that she was

terminating Menard because someone was upset about pictures he showed to them,

and because he allegedly insinuated that he wanted to have sex with other people's

wives.[113] She never saw the photograph at issue, nor did she recall whether anyone

described to her the image depicted in the photograph.[114]

That same day, on October 11, 2018, Targa representatives called Menard to

inform him that he was being terminated.[115] Dodson testified that the termination

process is "not a fast process."[116] However, Menard's termination took only two

days from the date Keller presented the accusations to HR on October 9 until he was

fired on October 11.[117]

---

[111] ROA.6668-6669, 6704, 6707, 6710-6712, 6714, 6718.
[112] ROA.6711-6712, 6722-2726.
[113] ROA.6716-6717.
[114] ROA.6721-6722.
[115] ROA.6328.
[116] ROA.6670-6671.
[117] ROA.6682.

## STANDARD OF REVIEW

In a bench trial, this Court reviews "a trial court's findings of fact for clear error and its conclusions of law de novo." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1115–16 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 101 (2021) (quotations omitted). As this Court has recognized, "[u]nder clear error review, if the trial court's factual findings are 'plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact.'" *Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016) (quoting *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 296 (5th Cir. 2008)). Thus, the District Court's factual findings should not be disturbed unless the Court, "viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 759 (5th Cir. 2017), *as revised* (Mar. 30, 2017) (quoting *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016)).

Further, "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 394-395 (1948). "The district court's credibility determinations receive particular deference when it sits as the trier of fact." *Griffin v. City of Lafayette*, 166 F.3d 340 (5th Cir. 1998).

## SUMMARY OF THE ARGUMENT

The District Court correctly found as a matter of law that the LEWS protected Menard from retaliation by his employer for his refusal to dilute a water sample at Berthelot's instruction. The District Court's interpretation and application of the statute is required by the plain language of the statute, which must be interpreted broadly to achieve the legislature's intent in enacting the statute to protect the environment as mandated by the Louisiana constitution. The District Court also applied the interpretation of the statute by the Louisiana Supreme Court in *Cheramie v. J. Wayne Plaisance, Inc.*, 595 So. 2d 619, 624 (La. 1992). Since Targa's requested reversal of the District Court's ruling is inconsistent with that Louisiana Supreme Court decision, before reversing the District Court, this matter should first be certified to the Louisiana Supreme Court on that question of Louisiana law.

Further, even though the District Court ruled that Menard was protected under the LEWS because of his refusal to dilute a water sample, the District Court opinion did not address an alternative claim which also supports a violation, that he reported the illegal request to his supervisor. The District Court did not address this because in a prior interlocutory ruling on summary judgment, the District Court had concluded that such reporting was not protected under the LEWS since Menard's job duties included reporting such violations. That earlier ruling was based on an earlier federal district court's opinion. Following this ruling by the District Court, a

Louisiana appellate court issued an opinion which reaches the opposite conclusion, affording whistleblower protection regardless of an employee's job duties. Properly applied to these facts, it would necessarily lead to a finding that Menard was also protected for his reporting of the illegal request. Again, if needed to sustain the trial court or to remand for a determination, the status of Louisiana law on this point should be certified to the Louisiana Supreme Court since it has not yet been considered by that court.

Targa also objects to the District Court's factual findings related to causation. However, the District Court reached those findings based on its review of the facts, conflicting evidence and testimony, and credibility determinations that could only be made live at trial based on witness demeanor, inflections, tone, and other factors. Thus, its findings of fact are entitled to particular deference and must stand because its findings were plausible in light of the record as a whole. Because the District Court found (1) that there was a close temporal proximity of only six days between Menard's refusal to dilute a sample and his termination; (2) that Targa's asserted reasons for Menard's termination were false under the facts; and (3) that Berthelot, the person with retaliatory animus, used the ultimate decisionmaker to fire Menard, there was ample evidence to support the finding that Menard was fired because of his protected act.

Targa particularly challenges the District Court's factual findings related to the cat's paw theory of liability. However, based on all the circumstances the trial court could infer that Keller and Berthelot spoke between the time of Menard's refusal to dilute a sample and the date that the termination process was initiated by Keller. Keller was the sole source of information about the accusations against Menard, which were relied upon through the chain to the ultimate decider, Keiser, who relied entirely upon Keller. Thus, the retaliatory animus remained intact and was imputed up the chain to the ultimate decisionmaker. The District Court concluded, based on all of the evidence, that Berthelot used the ultimate decisionmaker to retaliate against Menard. That finding was plausible in light of the record as a whole and cannot be reversed under the clear error standard of review.

Targa's final is that the District Court stated in its findings of fact that Menard was asked to dilute a sample, but it did not specifically say in those particular statements that Menard refused to do so. As a result, Targa claims that the District Court's findings should be reversed as clearly erroneous. This is not proper because the Court makes the finding elsewhere in the record. However, even without that the proper remedy would be a remand for further factual findings. However, the District Court's findings do include a finding that Menard proved his prima facia case because a refusal to participate in illegal conduct is protected under the LEWS. Thus, the District Court clearly found that Menard was protected not simply because he

was asked to do something illegal, but instead because he refused to do so. As such, a finding of a refusal to dilute was made by the District Court already.

For these reasons, the District Court's ruling was correct on the facts and on the law, and its final Judgment should be affirmed.

**ARGUMENT**

I. **The District Court Correctly Concluded that Menard's Refusal to Dilute a Sewage Sample Protected Him from Retaliation Under the LEWS**

    A. **The District Court's Conclusion Is Required Under the Text of the LEWS, Legislative Intent, the Louisiana Constitution, and Louisiana Supreme Court Jurisprudence**

The District Court concluded that Menard's refusal of Berthelot's instruction to dilute a sewage sample protected him from retaliation under the LEWS.[118] Targa contends that this was legal error and that the statutory language does not protect employees who refuse to break environmental laws at their employers' direction. Targa's position contradicts the plain language of the LEWS, the intent of the statute and the Louisiana constitutional mandate to protect the environment, and the Louisiana Supreme Court's interpretation of the statute.

*1. Plain Language of the LEWS*

The LEWS states, in pertinent part, that an employer cannot retaliate against an employee who "[d]iscloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer . . . that the employee reasonably believes is in violation of an environmental law, rule, or regulation." La. R.S. 30:2027(A)(1). The Louisiana Legislature has not defined any of the terms in the quoted provision, including the word "disclose."

Before the LEWS was amended in 1991, it referred not to an employee who

---

[118] ROA.5984 (¶ IV.A.4).

"discloses," but rather to one who "reports or complains" of, possible illegal acts. *Cheramie v. J. Wayne Plaisance, Inc.*, 595 So. 2d 619, 623 (La. 1992) (quoting language of pre-amendment statute). Targa argues that this change reflects an intent to narrow the scope of protection under the LEWS. But Targa cites no support for such a conclusion, no evidence of legislative intent to narrow the statutory protections, no Louisiana case law interpreting the post-amendment statutory language more narrowly, and no secondary sources suggesting that the amended statute should be interpreted to limit the scope of protection. In short, Targa asks this Court to find that the legislature narrowed the scope of the statute without providing any legal support for that conclusion when the amendment language suggests otherwise.

Targa claims that the legislature's decision to replace two words ("reports or complains") with one ("discloses") narrowed the scope of protection under the statute. However, the plain language and the subsequent treatment of the statute by Louisiana courts clearly demonstrate that the amendment was actually intended to **expand** the statute's scope. Thus, although the previous version of the statute listed two specific types of protected acts ("reports or complains"), the revised language more broadly protects any type of disclosure by an employee. This includes not just disclosures through reports and complaints as under the pre-1991 version, but also through any other acts that also constitute disclosures.

The definition of "disclose", which means to make something known,[119] supports the conclusion that the amendment expanded the reach of the statute. Thus, any act in which an employee makes known that an act is illegal is a disclosure. Under that definition, a "disclosure" would still include either a "report" or a "complaint," which were covered under the prior version of the statute. However, the definition of "disclosure" is even broader still, as it would include any other acts that an employee might use to make information known, such as oral or written statements that might not have been considered a "report" or a "complaint," but which would nevertheless constitute a "disclosure" afforded protection under the current statutory language.

The case law supports the conclusion that the term "disclose" should be interpreted expansively to still include "reports" and "complaints" within the scope of activities protected under the LEWS. In interpreting Louisiana law, including the LEWS, this Court is "bound by an intermediate state appellate court decision unless 'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 272 (5th Cir. 2000) (quoting *First Nat'l Bank of Durant v. Trans Terra Corp.,* 142 F.3d 802, 809 (5th

---

[119] *See, e.g.*, Merriam-Webster.com Dictionary, "Disclose," https://www.merriam-webster.com/dictionary/disclose (accessed Aug. 8, 2022) ( "to make known or public"); Collins English Dictionary - Complete & Unabridged 2012 Digital Edition, "Disclose," https://www.dictionary.com/browse/disclose (accessed Aug. 8, 2022) ("to make known; reveal or uncover").

Cir. 1998) (internal quotations and footnote omitted)). To that point, even though

the words "report" and "complaint" (which Menard clearly did) no longer appear in

the statute, Louisiana courts still continue to use those terms in describing protected

activities. *See, e.g.*, *Borcik v. Crosby Tugs, L.L.C.*, 2016-1372, p. 8 (La. 5/3/17), 222

So. 3d 672, 677 (stating throughout the opinion that LEWS protects the "reporting

of environmental violations"); *Collins v. State ex rel. Dep't of Nat. Res.*, 2012-1031,

p. 8 (La. App. 1 Cir. 5/30/13), 118 So. 3d 43, 49 (using the word "report"

interchangeably with "disclose" in setting forth the elements of LEWS claim); *Bear*

*v. Pellerin Const., Inc.*, 2001-0984, p. 5 (La. App. 4 Cir. 1/30/02), 806 So. 2d 984,

989, *writ denied*, 2002-0943 (La. 6/7/02), 818 So. 2d 777 (recognizing that the post-

1991 version of the LEWS applies to "a report of, or complaint of, an environmental

violation"); *Chiro v. Harmony Corp.*, 99-0453, p. 6 (La. App. 1 Cir. 11/5/99), 745

So. 2d 1198, 1201, *writ denied*, 1999-3346 (La. 1/28/00), 753 So. 2d 840 (finding

that protected acts under the LEWS included "alleged complaining and/or reporting

of the alleged environmental violation"). Based on these cases—all of which were

decided under the post-amendment version of the LEWS—Louisiana courts clearly

do not agree with Targa's proposed limitation of the LEWS.

Under the statute's plain language, Menard's refusal to dilute a sample and

his statement that they would "correct it the right way," by definition, are

"disclosures" by Menard to Berthelot that he believed that act he was instructed to

perform was illegal. As the Louisiana Supreme Court has held, a refusal to participate in an illegal act is a "complaint." *Cheramie*, 595 So. 2d at 624 ("Refusal to participate in illegal and environmentally damaging work is an extreme form of complaint, and constitutes 'complaining' under LSA–R.S. 30:2027(B)."). Thus, Menard's refusal to dilute the sample in this case was a complaint, a protected disclosure under both the previous and current versions of the statute. In refusing to participate in this act, Menard disclosed to Berthelot that he believed it to be illegal and was therefore protected under the LEWS.[120]

Notably, Targa's argument for a more limited reading of the LEWS has already been rejected by the Louisiana Supreme Court in *Cheramie*. Targa argues that if the legislature wanted to protect "refusals," it would have used that word. However, Targa ignores the fact that the word "refusal" was also not part of the statute when the Supreme Court decided *Cheramie*, yet the Supreme Court held the legislature intended to protect an employee who refused an employer's instruction to violate environmental laws. If Targa's argument held any weight, the Supreme Court would have decided *Cheramie* differently, since the word "refuse" was never

---

[120] For the same reasons that "disclosure" must be interpreted broadly, the term "supervisor" in the LEWS must also be interpreted broadly to include not just an employee's direct supervisor, but anyone who has supervisory authority over an employee. Here, that includes Berthelot, a District Manager, who although not Menard's supervisor, was the direct supervisor of Keller, Menard's "indirect supervisor" to whom Menard reported and answered to daily. Regardless, Targa did not raise this as an issue for review in its brief, and it has therefore waived any such argument on appeal.

in the LEWS. For the same reasons the Supreme Court declined to strictly construe the LEWS in *Cheramie*, it would reject that same position advanced today by Targa.

### 2. *Legislative Intent and Constitutional Mandate Behind the LEWS*

Even if this Court were to find that the term "disclose" in the LEWS is ambiguous and intent is not clearly stated, Louisiana's rules of statutory interpretation require the Court to interpret the statute in light of its purpose. La. Civ. Code arts. 10 and 12. The policy behind the LEWS is to protect the environment, which under Louisiana law is a **constitutional imperative** under the Louisiana Constitution, article IX, section 1, and "a matter of critical concern." La. R.S. 30:2002(1). The Louisiana Supreme Court has held that the LEWS must be given a "broad interpretation" that "furthers the constitutional directive and statutory purpose of the [Louisiana Environmental Quality Act] by protecting employees from retaliation or other adverse employment action for reporting possible environmental violations." *Borcik*, 222 So. 3d at 676. Thus, "the statute should not be construed to contravene its purpose or to provide a disincentive for reporting violations." *Id.* at 679.

Louisiana Courts have long held that the LEWS should be interpreted broadly to achieve its purpose in protecting the environment. In a case decided under the prior numbering of the law, the Louisiana First Circuit recognized the important role that the whistleblower provisions played in protecting the environment:

> La.R.S. 30:1074.1 is part of the Louisiana Environmental Quality Act. (La.R.S. 30:1051, et seq.) The purpose of the act, as set forth in La.R.S. 30:1053, is to provide for certain comprehensive policies that will maintain a healthful and safe environment.
>
> For that reason, we think the meaning that best conforms to the purpose of La.R.S. 30:1074.1 is that which protects employees from retaliatory action by employers when the former reports possible environmental violations not only by their own employer but by a third person as well. A contrary interpretation weakens the statute and runs counter to the intent of the legislature.

*Bartlett v. Reese*, 526 So. 2d 475, 477 (La. App. 1 Cir. 1988), *writ denied*, 532 So. 2d 177 (La.1988). Although the issue in *Bartlett* was whether the statute protected an employee for reporting a violation by a third party, the court—which expressly stated that its ruling was rooted in the statute's environmental protection purpose— endorsed a broad reading and expansive scope of protection. For more than 30 years, Louisiana courts have continued to interpret the statute broadly to expand, rather than limit, its protections. *See, e.g.*, *Borcik*, 222 So. 3d at 677 ("[A] broad definition of 'good faith' is necessary to uphold the purpose of the LEQA and the Louisiana Constitution's mandate"); *Collins*, 118 So. 3d at 49 (it would "frustrate the purpose of the" LEWS to require plaintiff to specify which environmental laws he believed were violated); *Cheramie*, 595 So. 2d at 624 (finding that refusing to participate in illegal act is a "complaint").

Targa's proposed reading of the statute, which directly contradicts the purpose of the statute and would frustrate the legislature's goal of protecting the environment as mandated by the Louisiana Constitution, should be rejected. The District Court's

ruling should be affirmed.

### 3. *Louisiana Supreme Court Jurisprudence*

The Louisiana Supreme Court has already recognized in *Cheramie* that a refusal to participate in a violation of environmental laws is protected. That decision has never been overturned or even questioned in the 30 years since *Cheramie* was decided. In *Cheramie*, an employee was terminated after he refused to participate at his employer's direction in what he believed to be an illegal act. The Court was tasked with applying the prior version of the statute that protected an employee who "reports or complains about possible environmental violations." *Cheramie*, 595 So. 2d at 623. The statute said nothing about an individual who refuses to participate in an illegal act, but the Supreme Court held that to give effect to the legislature's intent, it had to interpret the provisions of the LEWS broadly to achieve its purpose. Thus, the Court broadly interpreted the term "complaint" to hold that the LEWS protects an employee who refuses to participate in an illegal act.

There are clear similarities between Menard's case and *Cheramie*. In both cases, an employee refused to participate in an illegal act directed by his employer and was terminated because of his refusal. The policy behind the LEWS, to protect the environment, has remained unchanged since *Cheramie* was decided in 1992. As such, this case should be decided the same as *Cheramie*. For the same reasons the Supreme Court in *Cheramie* found that the employee was protected for his refusal

to participate in an illegal act, the District Court correctly found that Menard was protected for his refusal.

Targa argues that the Supreme Court's finding in *Cheramie* is no longer good law because of the amendment to the statute. However, neither the legislature nor the Louisiana courts have ever stated that the purpose behind the LEWS has changed. Significantly, the Supreme Court has never even questioned its decision in *Cheramie*. To the contrary, the Supreme Court's most recent opportunity to interpret the LEWS favorably cited its decision in *Cheramie*. In *Borcik*, 222 So. 3d 672, this Court certified a legal question to the Louisiana Supreme Court regarding the meaning of the phrase "good faith" in the LEWS. Finding the phrase ambiguous, the Supreme Court considered the purpose of the statute in determining that the term must be construed broadly. The Supreme Court's interpretation of "good faith" is not directly relevant here, but the fact the court looked to its previous decision in *Cheramie* for guidance on how to interpret the statute is. The *Borcik* court specifically speaks favorably of the *Cheramie* interpretation, saying, "[w]e also held that the employee's refusal to participate in illegal and environmentally damaging work could constitute 'complaining' under R.S. 30:2027 . . . . The *Cheramie* holding therefore supports a broad interpretation of the whistleblower statute." *Borcik*, 222 So. 3d at 677 (internal citations and footnotes omitted). This favorable treatment of *Cheramie* is further evidence that the decision remains good law and its holding

should be applied to this case, as the District Court correctly did in finding that Menard's refusal to dilute a water sample was a protected act under the LEWS.

## B.     Any Legal Question About the Interpretation of the LEWS Should be Certified to the Louisiana Supreme Court

If this Court concludes that it cannot affirm the District Court's Judgment based on the above-cited established principles of Louisiana law, Menard requests that this legal issue be certified to the Louisiana Supreme Court under Louisiana Supreme Court Rule XII, § 1. Certification to the Louisiana Supreme Court can be invoked by this Court on its own motion or upon motion or suggestion by any party. La. S. Ct. Rule XII, § 2.

Reversal of the District Court's Judgment would require this Court to act inconsistently with Louisiana Supreme Court precedent by narrowly interpreting the LEWS. Therefore, pursuant to the practices of this Court and the Louisiana Supreme Court Rules, Menard requests, rather than reverse the District Court, that this Court certify the following question to the Louisiana Supreme Court: "Whether the Louisiana Environmental Whistleblower Statute, La. R.S. 30:2027, protects an employee from retaliation by his employer when the employee refuses his employer's instruction to violate environmental laws."

**C.     As an Additional Basis for Affirming the District Court's Judgment, Menard's Report to His Supervisor of the Request to Dilute a Sewage Sample Was Protected Under the LEWS**

In addition to Menard's refusal to dilute a sewage sample, Menard also reported that request to his supervisor, Smith.[121] The District Court did not address this basis for the claim because in an earlier interlocutory ruling it incorrectly stated, relying upon *English v. Wood Grp. PSN, Inc.*, 2015 WL 5061164, at *13 (E.D. La. Aug. 25, 2015), that "a plaintiff cannot recover under the LEWS where the reporting activity giving rise to the whistleblower claim was part of his normal job responsibilities."[122]

However, after the District Court issued this ruling, the Louisiana First Circuit addressed this issue under a related but different whistleblower provision, La. R.S. 23:967. The Louisiana First Circuit expressly found that, inconsistent with the decision in *English*, even if an employee's job duties include reporting violations, the employee is protected as a whistleblower, because "the Louisiana legislature intended to protect whistleblowing employees, whether those employees were performing their job duties or not." *Derbonne v. State Police Comm'n*, 2019-1455, p. 16 (La. App. 1 Cir. 10/14/20), 314 So. 3d 861, 872, *writ denied*, 2020-01323 (La. 2/17/21), 310 So.3d 1152 (interpreting scope of protection under Louisiana

---

[121] ROA.6296, 6379-6380.
[122] ROA.5098.

Whistleblower Statute, La. R.S. 23:967). The First Circuit said, "If the legislature intended to distinguish between employees whose job duties included whistleblowing from employees whose job duties did not include whistleblowing, it could have done so. The legislature did not make such a distinction." *Id.*

Even though the *Derbonne* decision dealt with a different Louisiana employee whistleblower statute, that court's reasoning applies with even greater force here. As discussed above, the LEWS must be interpreted broadly to achieve its goals of protecting the environment. Thus, the District Court should have also found as a matter of law that, for the reasons forth in *Derbonne*, the LEWS protects employee whistleblowers even if their job responsibilities include reporting environmental violations.

The evidence and testimony presented at trial supports a finding that Menard reported Berthelot's request to Smith when Menard told him that Berthelot said he had a "quick fix" to the exceedance, which was diluting samples.[123] Thus, the record supports affirming the District Court's ruling in favor of Menard based on his reporting of the request to dilute a sample to Smith. However, if the Court does not find any other basis upon which to affirm the District Court's Judgment and further concludes that additional factual findings are necessary, Menard requests that the case be remanded to the District Court to supplement its findings of fact.

---

[123] ROA.6296, 6379-6380.

Finally, if the Court disagrees with the court in *Derbonne*, Menard requests that the following legal question be certified to the Louisiana Supreme Court: "Whether under Louisiana law an employee whose job duties include reporting violations of environmental laws is protected under the LEWS when he refuses his employer's instruction to violate an environmental law."

## II.     The District Court's Conclusion that Menard's Refusal to Dilute a Sample Was the But-For Cause of His Termination Was Plausible Based on the Evidence and Testimony Presented at Trial

Based on the evidence presented at trial, and exercising its authority as the trier of fact to resolve factual disputes and evaluate the credibility of witnesses, the evidence plausibly supports the District Court's conclusion that Menard's protected act was the cause of his termination. The District Court based this conclusion on several facts, including: (1) the close temporal proximity of only six days, including a weekend, between Menard's refusal to dilute the sample and his termination; (2) the factual inconsistencies and lack of support for Targa's alleged reasons for Menard's termination; and (3) the factual conclusion that the person with retaliatory animus, Berthelot, used the decisionmaker to bring about Menard's termination.[124] These factual findings related to causation are subject to the "clear error" standard of review.

---

[124] ROA.5985-5997.

Despite the deference that must be given to the District Court in evaluating witness credibility and other disputes of fact, Targa seeks in this appeal to relitigate the facts of the case. Specifically, Targa's statement of the case points to various alleged credibility questions that Targa raised at trial regarding Menard. The District Court already considered all of those same facts, just as it considered all of the inconsistencies in testimony among Targa's witnesses which raised questions about those witnesses' credibility, before rendering Judgment. The District Court did so based on the testimony of live witnesses at trial, which this Court does not have the opportunity to do. Even if this Court might have evaluated those factual disputes and questions of witness credibility differently, as long as the District Court's factual findings are plausible under the record, its Judgment should be affirmed.

Targa specifically challenges the District Court's factual findings as they relate to the cat's paw theory of liability.[125] However, that was not the sole basis for the District Court's factual finding that Targa improperly retaliated against Menard. The District Court's Judgment should be upheld because its conclusion was plausible under the direct and circumstantial evidence establishing the close

---

[125] Targa complains in its brief that the District Court denied summary judgment based on its potential liability under the cat's paw theory even though that issue had not been raised in the briefing. That is irrelevant. As the Supreme Court has recognized, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Thus, the District Court had the power to rule based on the legal theories that properly applied to the case, regardless of whether those theories were raised by the parties.

temporal proximity between the protected act and termination; the falsity of Targa's asserted reasons for termination; and the unbroken causal chain between Berthelot and Keiser under the cat's paw theory of liability.[126]

### A.   The District Court Correctly Determined that the Six-Day Period Between the Protected Act and Termination Was Evidence of Causation

Targa does not challenge the District Court's conclusion that the close temporal proximity between Menard's protected act and his termination provided some evidence of causation. Although temporal proximity is not sufficient to prove retaliation, this Court recognizes that it can establish a prima facie case of causation,

---

[126] Targa asks this Court to bind the District Court to statements it made in its Order denying Targa's Motion for Summary Judgment. In that Order, the District Court incorrectly stated that at trial, Menard would have to establish that Smith, Keller, or Fitzgerald had retaliatory animus and used Keiser to bring about the intended retaliatory action against Menard. Targa argues that the District Court erred in ruling in favor of Menard after trial because there was no evidence to establish that any of those three individuals had retaliatory animus. However, that denial of summary judgment was an interlocutory order which had no res judicata effect and could be revised by the court after considering the evidence presented at trial. *F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994), *opinion supplemented on denial of reh'g*, 30 F.3d 601 (5th Cir. 1994) ("A partial summary judgment order in accordance with Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision by the district court, and has no res judicata effect."); *United States v. Horton*, 622 F.2d 144, 148 (5th Cir. 1980) (quoting 6 J. MOORE'S FEDERAL PRACTICE s 56.04(1) (1975)) ("It is commonly held 'where the order of the court is a mere denial of the motion for summary judgment and the court does not specify what facts are uncontroverted, the order establishes nothing as the facts and all issues made by the pleadings are open at trial.'"); *Raymond James Tr., N.A., Tr. of E.C. Care Tr. v. Natchez Hosp. Co., LLC*, 2021 WL 5456980, at *1 (S.D. Miss. Nov. 22, 2021) (recognizing that "prior order denying partial summary judgment was interlocutory, not final, because it did not dispose of all of the claims asserted"); Thus, any statements in that Order regarding the facts of the case had no res judicata or other binding effect on the District Court at trial. The District Court could therefore make findings at trial that were consistent or inconsistent with the Order denying summary judgment based on the evidence. As a result, its Judgment cannot have been clearly erroneous simply because its factual conclusions were different from non-binding statements made in the Order denying summary judgment.

and it is a relevant consideration in determining pretext. *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243-244 (5th Cir. 2019); s*ee also Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 882 (S.D. Tex. 2009). In *Garcia*, 938 F.3d at 243, this Court found that two months was short enough to be relevant to the causation question. Thus, the District Court could not have clearly erred in finding that the four to six-day period in this case was a relevant factor. *See also Watkins v. Tregre*, 997 F.3d 275, 285 (5th Cir. 2021) (recognizing a two-day span as "near-immediate temporal proximity").

### B. The District Court Correctly Determined That the Falsity of Targa's Explanations for Menard's Termination Also Established Causation

Although Targa claims that each of the individuals in the chain of command had a "good faith belief" that the accusations leveled against Menard were true, Targa nowhere in its brief seriously disputes the District Court's factual findings that Targa's asserted reasons for termination were not supported. As this Court has recognized, "in an appropriate case, 'a factfinder may infer the ultimate fact of retaliation from the falsity of the [employer's] explanation.'" *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577–78 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (quoting *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002)). If the evidence shows that an incident was fabricated to create a pretext for terminating the plaintiff, the fact finder "could reasonably infer that [the plaintiff] was fired for an improper

purpose." *Parker v. State of Louisiana Dep't of Educ. Special Sch. Dist.*, 323 F. App'x 321, 328 (5th Cir. 2009). As the Supreme Court has recognized,

> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

After evaluating each of Targa's asserted reasons for Menard's termination in light of all of the evidence and testimony presented at trial, the District Court expressly stated that it "doubts the credibility of Targa's asserted legitimate non-retaliatory reasons for terminating" Menard.[127] That finding is plausible in light of the conflicting testimony and evidence regarding the accusations raised against Menard as the basis for his termination and the only source of the information. Based on the District Court's factual finding that Targa's asserted reasons for termination were not credible, it could reasonably infer that Menard's termination was an act of retaliation.

---

[127] ROA.5985 (¶ IV.B.3).

Specifically, although Targa claimed that Menard was terminated in part for work performance issues, Targa's witnesses admitted that this was not the reason he was terminated.[128] Targa also claimed that Menard was terminated for inappropriate conduct, including making inappropriate comments and showing an inappropriate photograph to a coworker. However, the record reflects that although Targa's policies stated that the reason for Menard's termination should be in his personnel file, his file said nothing about inappropriate conduct.[129] Instead, each of the claims about Menard's allegedly inappropriate conduct came solely from individuals who worked under Berthelot.[130] Other contradictions and inconsistencies in the testimony, set forth in greater detail in the Statement of the Case, *supra*, required the District Court to resolve factual disputes and led it to doubt the credibility of Targa's asserted reasons for termination.[131] Thus, after weighing all of the competing evidence, the District Court concluded that Targa's asserted reasons for termination were simply not credible. Since there is sufficient evidence in the record to support that factual finding, it was plausible and therefore cannot be clearly erroneous. Further, as a result of the factual conclusion that Targa's explanations for Menard's

---

[128] ROA.6125-6126, 6132, 6234-6235, 6716.
[129] ROA.6129-6131, 7061-7111.
[130] ROA.6233-6234, 7138
[131] ROA.5985 (¶ IV.B.3).

termination were false, the District Court could infer that retaliation was the only remaining possible explanation for the termination.

### C. The District Court Correctly Determined that Menard's Refusal to Dilute a Sewage Sample was the Cause of His Termination Under the "Cat's Paw" Theory of Liability

Targa primarily attacks the District Court's application of the facts of this case to the "cat's paw" theory of liability. As this Court has recognized,

> Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus. Under this theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action.

*Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). Applying this Court's test from *Zamora*, the District Court found that there was "sufficient circumstantial evidence to show that the person with the retaliatory animus [Berthelot] used the decisionmaker to bring about the intended retaliatory action."[132]

The District Court's finding that Berthelot had retaliatory animus is plausible based on the evidence and therefore is not clearly erroneous. The focus of Targa's argument, however, is that the District Court was clearly erroneous in concluding that Berthelot then used the final decisionmaker, Keiser, to bring about Menard's termination. In making that argument, Targa focuses narrowly on language from a

---

[132] ROA.5996-5997 (¶ IV.C.9).

case in which this Court applied the cat's paw theory to a situation where the individual with retaliatory animus "possessed leverage, or exercised influence, over the titular decisionmaker."[133] Targa improperly places excessive reliance upon that particular language. However, this Court has more recently articulated the "cat's paw" test as applying to a situation where the individual with retaliatory animus "**used** the decisionmaker." *Zamora*, 798 F.3d at 331 (emphasis added). Targa's suggestion that the "leverage or influence" from the older *Roberson* case is the sole basis finding causation under the cat's paw theory is unsupported.

In fact, as this Court recognized in *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 171 (5th Cir.2014) (another case that was decided more recently than *Roberson*), there are multiple ways that a person with retaliatory animus can supply causation under the cat's paw theory, one such example being "when the coworker 'had influence or leverage over the official decisionmaker.'" 753 F.3d at 171 (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)). This Court recognized another example in which a non-decisionmaker could cause a retaliatory termination, "when a coworker makes a recommendation to terminate and the decisionmaker is merely a rubber stamp on that coworker's decision." *Id.* (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)). Thus, this Court has already rejected the limited causation test that Targa proposes. As the

---

[133] Appellant Brief at 39 (quoting *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).

decisionmaker relied without substantiation on Keller's claims, despite her testimony to the contrary, the District Court reasonably concluded her decision was but a rubber stamp.

In addition, *Gorman* recognizes that the two cited examples were not an exhaustive list of how causation could be found under the cat's paw theory. Instead, this Court generally recognized that "a coworker who is aware of the plaintiff's protected activity may under certain circumstances supply the causation requirement." *Gorman*, 753 F.3d at 171. Of course, this Court could not have predicted and set forth every scenario by which the person with retaliatory animus could cause a termination. As a question of fact, causation will involve a distinct set of facts which must be evaluated in the context of that case. The District Court did exactly that, and after evaluating the facts of this case, it concluded that Menard's case presented an example where a co-worker—more particularly, a person with supervisory authority—who has retaliatory animus supplied the causation requirement by initiating the termination process. Because there is an unbroken chain from Berthelot all the way up to Keiser, the District Court was not "clearly erroneous" in finding that Menard's termination was because of his refusal to dilute a sample.

### 1. The Chain of Causation Remained Unbroken from Berthelot to Keller

Targa complains that the District Court erred in finding causation because it claims Keller, who championed the accusations against Menard, did not have retaliatory animus because the evidence was purportedly not sufficient to allow the District Court to impute Berthelot's retaliatory animus onto Keller. But only the District Court was in the position to hear and evaluate the testimony of Keller, Berthelot, and other witnesses, and to make credibility determinations based upon the tone of their voice, their demeanor, and other factors which this Court is not in a position to evaluate. Thus, the District Court's findings of fact on those matters are entitled to particular deference and cannot be overturned absent clear error. *Griffin v. City of Lafayette*, 166 F.3d 340 (5th Cir. 1998) ("The district court's credibility determinations receive particular deference when it sits as the trier of fact.")

As the District Court recognized, Keller was one of the links in the chain of causation from Berthelot up to the final decisionmaker. Based on the evidence and testimony presented at trial, the District Court made credibility determinations and drew inferences from the timing of events, the suspicious facts and circumstances surrounding Menard's termination, and the lack of any investigation into the alleged complaints against him to conclude that Berthelot initiated the process that caused Menard's termination. Thus, based on the evidence and the District Court's

credibility determinations, the record supports the conclusion that Targa terminated Menard because of his protected act.

The District Court specifically relied upon several undisputed facts as well as circumstantial evidence which supports its finding about Keller's involvement in bringing the animus into the decision. First, Keller reports directly to Berthelot.[134] Because of that, the Court reasonably concluded, in combination with all of the other evidence, that Berthelot had sufficient influence over Keller to cause him to put Menard's retaliatory termination into action. Second, Keller agreed at trial that he had plenty of time to speak with Berthelot during the four days between when Menard refused to dilute the sample until Keller brought forth the accusations about Menard.[135] Under Targa's approach, the case could not be established unless Keller would have admitted that he took part in a plan for retaliatory termination. Such direct evidence would be unlikely and impossible in most cases. However, in light of all of the evidence, the District Court reasonably concluded that between Menard's refusal to dilute a sample and the actions that would be taken against him Keller and Berthelot worked together to do so.

Third, Keller spoke to Berthelot on October 9 about his plans to bring the accusations against Menard. However, Menard was not in Berthelot's chain of

---

[134] ROA.5987 (¶ IV.C.8.b).
[135] ROA.5995 (¶ IV.C.8.i.v).

command or within the operations division.[136] The District Court reasonably concluded, in light of all of the other direct and circumstantial evidence, that this conversation was in furtherance of Berthelot's efforts to have Menard terminated as retaliation for his refusal to dilute the sample.

Fourth, Keller admitted at trial that he had previously told Menard that if Menard "made Berthelot look bad, [] Berthelot would throw him under the bus."[137] Keller further admitted that he had told Menard that "if he made [] Berthelot look bad[,] [] it would not be good."[138] The Court could have reasonably concluded from that testimony that Keller believed the same would happen to him if he made Berthelot look bad, so he participated instead in throwing Menard under the bus.

Fifth, the testimony regarding how and when Keller learned about the accusations against Menard, and exactly what he was told, is littered with inconsistencies and contradictions that call into question not just the accusations themselves, but more significantly Keller's credibility. The record is replete with such inconsistencies, including contradictions between Keller and Richard's testimony about when they discussed the incident with the photograph which Targa contended was the primary basis for Menard's termination, with Richard testifying

---

[136] ROA.5995 (¶ IV.C.8.i.iv).
[137] ROA.5994-5995 (¶ IV.C.8.i.ii).
[138] ROA. 5995 (¶ IV.C.8.i.iii).

that it was not until after the termination.[139] Based on these inconsistencies and contradictions, and in light of all of the other circumstantial evidence, the District Court reasonably concluded that Keller's testimony was not credible and that Keller was acting with or on behalf of his direct supervisor Berthelot to pursue Menard's termination based on an incident that Richard never reported, never complained about, and which did not even bother him.

Thus, in light of all of this evidence, including the District Court's credibility determinations, the record supports the District Court's conclusion that Berthelot used Keller to raise accusations against Menard in an effort to retaliate against him for refusing to comply with his instruction to dilute a sample. The District Court was not "clearly erroneous" in reaching that conclusion which is plausible and based on the record.

For all of the above reasons, Targa's reliance upon *Peters v. Harrah's New Orleans*, 418 F. Supp. 2d 843, 850 (E.D. La. 2006) is misplaced. First, that case was decided on summary judgment, unlike this case, where the District Court was charged with evaluating all of the evidence and witness credibility at trial. Second, the district court in *Peters* focused solely on the same limited "leverage or influence" language that Targa relies upon for the cat's paw analysis. However, as discussed above, this Court in *Gorman* (which was decided after *Peters*) recognized that

---

[139] These inconsistencies are set forth in greater detail in the Statement of the Case, *supra*.

"leverage or influence" is only one potential example of a scenario in which a coworker can cause a retaliatory termination. Third, and most importantly, the reason summary judgment was granted in *Peters* is that the plaintiff's causation argument was based solely on speculation and not supported by any facts. In this case, however, the District Court considered all of the evidence and testimony set forth above which supports its conclusion that Keller's involvement in Menard's termination was a link in the unbroken chain from Berthelot to Keiser. The District Court's findings are plausible and supported by the record and therefore cannot be clearly erroneous.

### 2.    The Chain of Causation Remained Unbroken from Keller to Targa's HR Department

The next link in the chain is Targa's HR department. It is undisputed that Keller initiated and led the termination process against Menard. Significantly, the District Court found that not a single person in the decision-making process questioned the accusations that Keller brought to them or took any steps to verify the information that resulted in Menard's termination.[140]

Targa argues that the complete lack of investigation somehow supports Targa, since that lack of investigation shows that Targa truly believed the asserted reasons for termination, and that each person in the chain acted in "good faith" and did not intend to retaliate against Menard. That argument is directly contrary to the law in

---

[140] ROA.5993 (¶ IV.C.8.g.xxxiii).

this Circuit. As this Court has found, "if an independent investigation 'takes [a supervisor's biased report] into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified,' the supervisor's action 'may remain a causal factor.'" *Zamora*, 798 F.3d at 334–35 (alterations in original) (quoting *Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011)). Thus, when an employer fails to do any independent investigation of the accusations that form the basis of a termination decision, the original retaliatory animus is imputed to the employer, because the causal link between the employee's protected act and his subsequent termination remains intact. *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996) ("If, on the other hand, Aguero did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of Clark and Kelley, the causal link between Long and Reavis's protected activities and their subsequent terminations would remain intact."); *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007) ("Because the jury could therefore conclude that McCune conducted no independent investigation, the 'causal link' between Vela's discriminatory animus and Arismendez's termination was not broken."); *Dumas v. Union Pac. R.R. Co.*, 2007 WL 9701323, at *5 (M.D. La. June 27, 2007), *report and recommendation adopted*, 2007 WL 9701298 (M.D. La. July 31, 2007), *aff'd*, 294 F. App'x 822 (5th Cir. 2008) ("An employee can prove causation by showing that the final decision

maker's decision was not based on his own independent investigation, but rather was a result of influence by other employees.").

The District Court found that Targa did not investigate the accusations against Menard. Every single person relied entirely on what Keller told them about those accusations.[141] Nobody in the process spoke to Menard or to any of the employees to whom Menard's allegedly improper conduct was directed.[142] In fact, they never even knew the names of those employees.[143] (Judgment at 12.) Because the District Court found that Targa's HR department conducted no independent investigation into the accusations that were being made against Menard, under the law of this Circuit as set forth above, "the 'causal link' between [Berthelot's] discriminatory animus and [Menard's] termination was not broken." *Arismendez*, 493 F.3d at 608.

Because the law is clear on that point, Targa tries to avoid discussing the legal impact this lack of investigation had. Instead, Targa attempts to shift the discussion away from that point by arguing that as a result of the lack of investigation, Targa cannot be liable under the cat's paw theory because the individuals in the chain of command allegedly had a "good faith basis" for believing the accusations against Menard. In other words, Targa contends that if an employer turns a blind eye to the truth, it should be insulted from liability for any retaliation of which it is willfully

---

[141] ROA.5989 (¶ IV.C.8.g.x).
[142] ROA.5990-5991 (¶ IV.C.8.g.xii and xix).
[143] ROA.5990 (¶ IV.C.8.g.xvii).

ignorant. However, none of the cases cited by Targa as support for its "good faith" argument have anything to do with the cat's paw theory of liability.[144] Thus, each of these cases is irrelevant to the pertinent question, which is whether the causal link in the chain of retaliation remains intact under the cat's paw theory when an employer conducts no independent investigation into the alleged non-discriminatory reasons for termination. As this Court has already recognized in *Zamora* and numerous other cases, the answer to that question is plainly "yes." The District Court did not err in reaching that same conclusion.

### 3.    The Chain of Causation Remains Unbroken from Targa's HR Department to the Final Decisionmaker, Keiser

For many of the same reasons discussed above, the chain of causation continued unbroken through the final link from Targa's HR representatives to the ultimate decisionmaker, Jessica Keiser. Keiser claimed that she was not aware of Menard's protected activity. Because of her alleged lack of knowledge, Targa contends that, just like the HR representatives, she acted in good faith in relying on the accusations against Menard that were presented to her. Again, Targa is not protected from liability simply because the ultimate decisionmaker did not know

---

[144] Even if the cases cited in Targa's Appellant Brief at footnotes 168-170 had anything to do with the cat's paw theory that is at issue here, based on the evidence and testimony presented at trial, the District Court would not have been clearly erroneous in concluding that Targa did not act in "good faith" under the circumstances in failing to conduct any investigation or speak to any of the individuals purportedly involved in the accusations. Further, Targa's conclusory statements that its representatives acted in "good faith" does not make it true, particularly as the facts belie that claim where the decision to terminate Menard was made less than two full days after Keller first brought the accusations against Menard to HR.

about the underlying retaliatory animus that drove the process. In fact, this is *exactly*

why the cat's paw theory exists. As this Court has recognized:

> In *every* case involving a cat's paw theory of causation, the ultimate decisionmaker bases his decision on a non-retaliatory reason. Indeed, that is why cat's paw analysis is needed: The plaintiff cannot show that the decisionmaker harbored any retaliatory animus. But because the supervisors caused that decision through actions motivated by retaliatory animus—in effect manipulating the decisionmaker into taking what appears to the decisionmaker to be a non-retaliatory action—the employer is liable.

*Zamora*, 798 F.3d at 335 (italics in original).[145]

Based on the law in this Circuit, whether Keiser believed that the claims being

made against Menard were legitimate is irrelevant. This Court in *Zamora* and other

cases has held that Menard can prove retaliation based on circumstantial evidence

that establishes that the person with retaliatory animus, Berthelot, manipulated the

process to cause Targa to take action against Menard, even if Keiser as the ultimate

decisionmaker did not believe it was retaliatory. *U.S. Postal Serv. Bd. of Governors*

*v. Aikens*, 460 U.S. 711, 714 n.3 (1983) ("As in any lawsuit, the plaintiff may prove

his case by direct or circumstantial evidence. The trier of fact should consider all the

evidence, giving it whatever weight and credence it deserves."); *McCoy v. City of*

---

[145] Though this Court in *Zamora* used the word "supervisor," the Court later recognized that a plaintiff can also establish causation under the cat's paw theory when the retaliatory actions are taken by a coworker who is not a supervisor or a decisionmaker. *Gorman v. Verizon Wireless Texas*, L.L.C., 753 F.3d 165, 171 (5th Cir. 2014); *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017), *as revised* (Mar. 30, 2017) ("We read the *Zamora* court's use of the word 'supervisor' to conform to the facts of that case, which involved retaliatory action taken by several of the plaintiff's supervisors, rather than to conflict with the *Gorman* court's recognition that a non-supervisory coworker may be the earlier agent who sets off the causal chain.").

*Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (recognizing that plaintiffs "may prove a claim of . . . retaliation either by direct or circumstantial evidence.")

As set forth in detail above, the District Court rendered Judgment against Targa based on its evaluation of all of the evidence, testimony, credibility determinations, and resolutions of factual disputes that were presented at trial. The District Court's ruling was both supported by the law and based upon the evidence before it. Targa now asks this Court to step into the shoes of the District Court and reevaluate all of that evidence and testimony, including credibility determinations, to reverse the District Court's conclusions of fact on the issue of causation. There is simply no support for this Court undertaking the same laborious exercise the District Court has already completed and which is entitled to deference under the "clear error" standard of review. Every single factual finding and conclusion reached by the District Court is plausible and supported by the record. For these reasons, the District Court's conclusion that Menard was terminated because of his protected act of refusing to dilute a sample should be affirmed.

## III. The Record Clearly Supports the District Court's Finding of a Causal Link Between Menard's Refusal to Dilute a Sample and His Termination

Targa's final argument is that the District Court erred because it did not specifically state in its findings of fact that it was Menard's **refusal** to dilute the sample that caused his termination. Instead, the District Court stated only that Berthelot asked Menard to dilute the sample. Based on this purported omission in

the findings of fact of Menard's refusal to dilute the sample, Targa claims that the District Court's findings were "clearly erroneous" and must be reversed. Targa's position is wholly without merit.

First, the record clearly establishes that the District Court found that Menard was protected because he refused to dilute a sample. The District Court's Judgment plainly states that the first prong of Menard's *prima facie* case was met because the Court has previously ruled in denying Targa's motion for summary judgment that "a refusal to participate in illegal and environmentally damaging conduct is a protected activity under the LEWS."[146] Thus, reading that statement in the context of the rest of the findings, the District Court clearly intended its factual findings to include not just that Berthelot **asked** Menard to dilute a sample, but further that Menard had **refused to do so**. Otherwise, the District Court's reference to Menard's *prima facie* case being met by a refusal to participate in an illegal act would not make any sense. Thus, based on the record as a whole, there is no support for Targa's claim that the District Court's findings were clearly erroneous simply because it did not restate its prior finding regarding Menard's refusal to dilute a sewage sample, since that finding was plainly apparent from the face of the Judgment.

Second, even if the record did not contain this conclusion, Targa cites no legal support for reversing a district court's judgment simply because of the court's

---

[146] ROA.5100, 5984 (¶ IV.A.4).

omission of a single fact from the court's findings of fact, like the omission that Targa complains of in this case. The few cases that Targa does cite plainly do not support its position. In one of those cases, *In re Ithaca Corp.*, 582 F.2d 3 (5th Cir. 1978), the district court entered judgment but failed to provide **any** findings of fact or conclusions of law. Even under those extreme circumstances, this Court did not reverse the district court's judgment. Instead, this Court recognized that "[w]hen, because of absence of findings of fact or conclusions of law, an appellate court cannot determine whether the record supports the trial court decision, it should remand the action for entry of findings of fact and conclusions of law." *Id.* That is the same conclusion that this Court reached in the other cases cited by Targa. *S. S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965) ("Our action here is confined to a remand for further findings."); *Golf City, Inc. v. Wilson Sporting Goods, Co., Inc.*, 555 F.2d 426, 438 n.20 (5th Cir. 1977) (in light of insufficient findings of fact, remanding to judge who replaced prior district court judge to make new findings of fact based on the existing record, to supplement the record, or to grant a new trial). Thus, even if the District Court's omission of a statement indicating that Menard refused to dilute the sewage sample could not otherwise be resolved by looking to the record as a whole to determine what the District Court meant, that still would not require this Court to reverse the

Judgement. Instead, it would merely allow this Court to remand the case with instructions to clarify its findings of fact consistent with Federal Rule 52.

### CONCLUSION

For the reasons set forth above, Appellee Kirk Menard respectfully requests that the Court deny the appeal filed by the Appellant Targa Resources, LLC, and affirm the District Court's Judgment in favor of Menard.

SUBMITTED BY:

*s/ Roy L. Bergeron, Jr.*
Eulis Simien, Jr., Bar # 12077
eulissimien@simien.com
Roy L. Bergeron, Jr., Bar # 33726
roybergeron@simien.com
Simien & Simien, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809-0000
(225) 932-9221; (225) 932-9286 (fax)

ATTORNEYS FOR APPELLEE KIRK MENARD

## CERTIFICATE OF SERVICE

I certify that on August 15, 2022, the foregoing document was served, via the

Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the

following registered CM/ECF users:

Daniel Patton
dpatton@scottpattonlaw.com
Scott Patton PC
5301 Katy Freeway, Suite 201
Houston, Texas 77007

Kyle A. Ferachi
kferachi@hinshawlaw.com
Hinshaw & Culbertson, LLP
400 Convention Street, Suite 1001
Baton Rouge, Louisiana 70802

*s/ Roy L. Bergeron, Jr.*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5th CIR. R. 32.1, this document contains 12,849 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2206 Build 16.0.15330.20260) 32-bit, in Times New Roman 14-point font.

*s/Roy L. Bergeron, Jr.*